**IN THE UNITED STATES DISTRICT**
**COURT FOR THE DISTRICT OF COLORADO**
**Judge Daniel D. Domenico**

Case No. 1:18-cv-02968-DDD-STV

STEPHEN GARRETT,

     Plaintiff,

v.

THE BOARD OF THE COUNTY COMMISSIONERS OF THE COUNTY OF
FREMONT; CORRECTIONAL HEALTHCARE COMPANIES, INC.; CORRECT
CARE SOLUTIONS, LLC; GREAT PEAK HEALTHCARE SERVICES, P.C.;
CHC COMPANIES, INC.; NATCORE HEALTHCARE INDUSTRIES, INC.;
WELLPATH LLC; ALLEN COOPER; PETER CEDERGREEN; TRAVIS
WATERS; GEORGE CALLAHAN; DANIEL VAUGHT; JAMES BEICKER; TY
MARTIN; JUSTIN GREEN; JOHN RANKIN; CARRIE HAMMEL; SARAH
BRASSFIELD; MORGAN ROQUEMORE; TRAVIS TAYLOR; MICHAEL
MOORE; AMANDA LUCERO; ANDREA HOPKINS; STEPHEN KREUGER;
JEREMY MILLER; JOHN RICCI; CHARLENE COMBS; BRANDON
O'GRADY; CORY BURTON; JAESON WATTS; CALEB CHASE; BRANDON
LOVATO; STEPHANIE REPSHIRE; KATHLEEN MAESTAS; RAYMOND
HERR; SHARON ALLEN; BRENT MERLO; JORDAN PETERS; ADAM
BEATY; JOHN AND JANE DOES 1–10; and DOE CORPORATIONS 1–10,

     Defendants.

---

## ORDER ON MOTIONS TO DISMISS

---

The plaintiff in this case alleges constitutional harms, federal statutory
violations, and negligence arising from a sustained period of bodily restraint after
he attempted suicide during his pretrial detention. Defendants are an assemblage of
thirty-nine named and additional unnamed individuals and entities. Before the
Court are seven fully briefed motions to dismiss, covering all defendants, for failure
to state a claim under Fed. R. Civ. P. 12(b)(6).

## I. ALLEGATIONS

The following allegations are taken from the Plaintiff's Amended Complaint (Doc. 14) and are treated as true for purposes of assessing the motions to dismiss. *See Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013).

### A. Allegations Concerning the Plaintiff

Plaintiff Stephen Garrett was arrested on August 10, 2016 and at all relevant times was a pretrial detainee at the Fremont County Detention Center, a division of the Fremont County Sheriff's Office. During the course of his arrest, it became known to officers that Mr. Garrett is mentally infirm. On November 15 and 16, 2016, he informed personnel at the detention center that his depression and suicidal ideation had developed into an acute and spiraling mental health crisis. On November 16, he told Defendant Sarah Brassfield,[1] a county employee, that he was "seriously and imminently contemplating suicide." She responded: "I wish you would f*cking kill yourself."

Hours later, on November 17, Mr. Garrett used a razor to slice open his left arm, cutting his radial artery and causing significant blood loss. Mr. Garrett was transported to the hospital, where his wounds were sutured and dressed, and was returned to the detention center and placed in solitary confinement. He received no mental health attention or intervention and, later that day, removed the bandage

---

[1] This Order refers to Defendants by name only as specified in the Amended Complaint. Where no Defendant is alleged to be specifically responsible for any action or omission, this Order merely reports, consistent with the Amended Complaint, Mr. Garrett's experiences with "officers," "staff," "medical personnel," and the like.

from his own arm and tried to reopen the wound. Officers discovered the bloody bandage on the ground, called for medical transport, and took Mr. Garrett back to the hospital, where staff noted no significant additional harm and re-dressed the wound. Early on November 18, Mr. Garrett was returned to the detention center, where officers and medical personnel placed him in a restraint chair—a device with straps across the legs, abdomen, chest, and arms. Officers also placed "transport gloves" and metal handcuffs on him.

Over the next twenty-eight days, Mr. Garrett remained in some form of bodily restraint, including the chair, gloves, handcuffs, or a wrist-waist restraint belt. During the long periods his hands were in the gloves, moisture caused deterioration of the skin on his hands, which painfully molted when the gloves were removed. Once, detention center staff cleaned the gloves with a commercial-grade aerosol disinfectant and placed them back on Mr. Garrett's hands, causing searing pain to his already-raw skin.

Mr. Garrett was sometimes permitted to choose the method of his restraint: he could remain in the chair with the gloves and handcuffs, or he could use the wrist-waist restraint belt with the gloves and handcuffs. Choosing the latter meant being placed in an observation cell with bright fluorescent lights, where he was made to keep his hands in view. He could only stand or lie on his back and could not use a blanket. As such, he became sleep-deprived. To get rest, he would opt to be strapped down in the chair.

Mr. Garrett also has a known seizure disorder, for which he was over-prescribed medications, causing physical instability. When permitted to walk, he would trip on stairs and cut his head and suffer headaches. On three occasions, he lost consciousness in the chair. Once, his over-medicated, sleep-deprived, and unconscious state caused him to vomit undigested food and aspirate the vomit while restrained. Because of the restraints, he was unable to signal for help, though he did receive it.

At all times, Mr. Garrett remained in the highly trafficked and monitored "booking area" of the detention center. It was "obvious to anyone observing . . . that he was in a consistent state of crisis and experiencing excruciating discomfort, severe sleep deprivation, and that his prolonged restraint (and lack of mental health care) was causing [him] extreme mental and physical distress." He was unable to access certain services programs, and activities the detention center, including telephone, in-person visitation, outdoor exercise, social interaction, and medical "kite" and grievance systems. He pleaded with detention center staff and medical personnel to be released from his restraints. He requested that Fremont County and its personnel "modify" their restraint chair and soft restraint "policies," or "any associated actual practices or customs regarding [their] use," which were "inhumane, degrading, and a violation of his rights." He sent detention center personnel and medical staff formal grievances. But despite his pleas and mental distress during this time, he received no "meaningful or timely" mental health

treatment, intervention, consultation, or regular monitoring from his arrest until mid-December.

Around December 16, Mr. Garrett was transferred to the Colorado Mental Health Institute for a competency evaluation in connection with his pending charges. At the institute, his physical and mental health improved. He interacted with others without incident, maintained his weight and nutrition, and managed the side effects related to his medications. He asserts that he is "highly receptive to meaningful treatment by appropriately-trained [sic] staff," and "the restraints and solitary confinement utilized by personnel at [the detention center] are absolutely unnecessary provided that he has appropriate mental health treatment and support." Around January 17, 2017, Mr. Garrett was transferred back to the detention center and returned to solitary confinement, where he suffered physical health deterioration with significant weight loss, increased suicidal ideation, and mental suffering. This confinement lasted several months, and he was only allowed out of his cell for one hour per day.

Mr. Garrett further alleges that on April 23, 2017, a few days after he consulted with his counsel in this case, Defendant Brent Merlo, an officer in the detention center, opened the cell door of an inmate who intended to harm Mr. Garrett during a no-contact "lockdown." That inmate "rushed [Mr. Garrett] and physically engaged him." On about April 25, detention center personnel did this again during another lockdown, and the same inmate again attempted to harm him. These actions were coordinated, facilitated, and encouraged by Defendant Justin

Green. When the Mr. Garrett confronted officers about this retaliatory behavior, the officers responded, on more than one occasion, that it was related to his intention to file a lawsuit against detention center staff. Mr. Green specifically told Mr. Garrett that "life would be hard" if he filed one. Detention center staff also began serving Mr. Garrett cups of sausage grease for breakfast following his complaints about small pieces of metal in his food.

**B. Allegations Concerning Defendants**

Defendants Brassfield, Merlo, and Green are the only defendants alleged by name to have engaged in any specific conduct in the Amended Complaint. Those three, and all other defendants are grouped into one or more of five categories and tied to general allegations:

(1)　　**"Fremont County Defendants"**:  The Board of County Commissioners of the County of Fremont, Sheriff Allen Cooper (in his official capacity), former Sheriff James Beicker (in his official capacity), and former Sheriff Ty Martin (in his official capacity). These defendants are divisions of a municipality, the latter of which is alleged to be the "final policymaker for Fremont County with respect to all matters . . . , including the [detention center]."

(2)　　**"Corporate Defendants"**:  Wellpath LLC, Correctional Healthcare Companies, Inc.,[2] Correct Care Solutions, LLC, CHC Companies, Inc., Great Peak Healthcare Services, P.C., and Natcore Healthcare Industries, Inc. Mr. Garrett alleges, on information and belief, these defendants have "contracted with Fremont

---

[2] This entity has not been served with process.

County during the relevant time period through a direct contract or sub-contract with another or related entity to provide medical services to inmates and pretrial detainees at the [detention center] and supervise[] and implement[] such care."

Mr. Garrett alleges these defendants, acting under color of state law pursuant to their contracts, maintained "policies and practices of systematic isolation and solitary confinement of detainees in mental health crises, inadequate staffing patterns, inadequate behavioral health assessment, diagnosis, and intervention, inadequate mental health care and programming, and a pattern of over-medicating and warehousing detainees in lieu of providing more comprehensive interventions."

(3) **"Medical Provider Defendants"**: Raymond Herr, M.D., Sharon Allen, M.D., Stephanie Repshire, LPN, Kathleen Maestas, LPN, Peter Cedergreen, L.P.C., Adam Beaty, R.N., Travis Waters, George Callahan, and Daniel Vaught. Mr. Garrett alleges that these defendants, acting under color of state law, are "agent[s], employee[s], and/or subcontractor[s] of one or more of the Corporate Defendants and w[ere] responsible for providing medical care to [him] during his pretrial detention." Mr. Herr was a policymaker and Chief Medical Officer for several Corporate Defendants. Mr. Garret alleges that "Defendants Vaught, Cedergre[e]n, Callahan, Waters, and Beaty, among others providers . . . failed to properly assess and monitor" him, "failed to properly address the acute side effects caused by over-medication that resulted in [him] falling and injuring himself," "fail[ed] to intervene during periods of unnecessary and extremely harmful solitary confinement," and

"fail[ed] to provide reasonable mental health interventions despite [his] numerous and desperate pleas."

(4) "**FCDC Personnel**"[3]:  James Beicker (individually), Ty Martin (individually), Justin Green, John Rankin, Carrie Hammel, Sarah Brassfield, Morgan Roquemore, Mackenzie Roquemore, Travis Taylor, Michael Moore, Amanda Lucero, Andrea Hopkins, Stephen Kreuger, Jeremy Miller, John Ricci, Charlene Combs, Brandon O'Grady, Cory Burton, Jaeson Watts, Caleb Chase, Brandon Lovato, Brent Merlo, and Jordan Peters. Of these each of these defendants, Mr. Barret alleges "[a]t all material times, this defendant was an agent and/or employee of Fremont County, working at the Fremont County Detention Center, and acting under color of state law."

(5) "**Individual Defendants**":  Medical Provider Defendants and FCDC Personnel combined. As a catch-all, Mr. Garrett alleges that "[e]ach of the Individual Defendants named in this lawsuit and identified in the preceding paragraphs were either (1) personally and actively involved . . . in direct observation and . . . prolonged restraint, solitary confinement, and/or retaliation directed towards the Plaintiff; (2) failed to intervene despite a duty and opportunity to do so; or (3) otherwise acquiesced in the illegal conduct described."

---

[3] Alternatively referred to in the Amended Complaint as "FCDC personnel," "FCDC staff," "FCSO staff," or "FCSO personnel" (*see* Doc. 14, at 14), and unintentionally as "FSCO officers" (*see, e.g.*, *id.* at 16), or casually as "officers." (*See, e.g.*, *id.* at 17.)

### C. Causes of Action and Procedural History

Mr. Garrett filed the Complaint on November 11, 2018 and an Amended Complaint on February 13, 2019. He alleges deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment against all Defendants; excessive force in violation of the Fourteenth and Fourth Amendments against the Individual Defendants; retaliation in violation of the First Amendment against Defendants Merlo and Green; medical negligence against the Medical Provider Defendants and Corporate Defendants; negligence in operation of a jail against the Fremont County Defendants and Individual Defendants; and violations of the Americans with Disabilities Act ("ADA") and Rehabilitation Act against the Fremont County Defendants. Defendants filed seven separate motions to dismiss on May 17 and 21, 2019, on a host of grounds including qualified immunity, statute of limitations, and failure to plausibly plead entitlement to relief. On June 25, 2019, Magistrate Judge Scott T. Varholak stayed all discovery pending resolution of the FCDC Personnel's entitlement to qualified immunity. The motions to dismiss are ripe for review. (*See* Docs. 64–69, 70–71, 85–97.)

## II. ANALYSIS

### A. General Pleading Standards

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "[D]etailed factual allegations" are not required, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but the Rule calls for sufficient factual matter, accepted as

true, to "state a claim to relief that is plausible on its face." *Id.* at 570. "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009). "The degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008). "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.*

## B. Section 1983 Claims Against Individual Defendants Other than Ms. Brassfield, Mr. Merlo, and Mr. Green.

The Tenth Circuit warns that "complaints in [Section] 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." *Id.* at 1249. To plausibly state a claim, a plaintiff must "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him." *VanZandt v. Oklahoma Dept. of Human Servs.*, 276 F. App'x 843, 848 (10th Cir. 2008) (emphasis in original) (finding that plaintiff's use of the phrase "the Defendants assigned to the Sequoyah County office" had failed to individualize each of the defendant's alleged misconduct from the collective group); *see also Robbins*, 519 F.3d at 1250 ("Given the

complaint's use of either the collective term 'Defendants' or a list of defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."); *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007) (to state a claim in federal court, "a complaint must explain what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what specific legal right the plaintiff believes the defendant violated"). It is not for a court to

> speculate as to the identity of the Defendants [certain] allegations are levied against as "the burden rests on the plaintiffs to provide fair notice of the grounds for the claims made against each of the defendants." To carry their burden, plaintiffs under the *Twombly* standard must do more than generally use the collective term "defendants."
>
> This Court, in *Robbins*, placed great importance on the need for a plaintiff to differentiate between the actions of each individual defendant and the actions of the group as a whole. This is because the purposes of plausibility, notice and gatekeeping, are best served by requiring plaintiffs to directly link an actual individual with the alleged improper conduct. When a plaintiff "fails to isolate the allegedly unconstitutional acts of each defendant," adequate notice is not provided to each defendant.

*VanZandt*, 276 F. App'x at 848 (quoting *Robbins*, 519 F.3d at 1250).

The Amended Complaint is largely based on what it calls a "collective decision by Fremont County policy makers, individual officers, individual medical providers, and private for-profit healthcare companies." (Doc. 14, at 1.) This assertion of collective responsibility is difficult to square with *VanZandt* and

*Robbins.* Other than with respect to Ms. Brassfield, Mr. Merlo, and Mr. Green, the Amended Complaint alleges no specific or discrete unconstitutional conduct by any Individual Defendant. But Mr. Garrett nevertheless believes he has sufficiently pleaded their involvement. He argues that, unlike in *Robbins*, he grouped the Individual Defendants into clearly defined categories based on the relevant factual assertions and claims for relief. But he provides no law supporting that he may sidestep federal pleading requirements by roughly dividing defendants into groups and generally averring that each was "personally and actively involved."[4] In *VanZandt*, the Tenth Circuit rejected a similar attempt to partition a group of only five individuals, saying that the plaintiff could not generally attribute certain "misstatements" to the group without "isolate[ing] the allegedly unconstitutional acts of each defendant." *Id.* at 849.

The absence of sufficient allegations is especially glaring where, as here, the asserted constitutional violations require analysis of a defendant's subjectively culpable state of mind, *see, e.g.*, *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (deliberate indifference), or a fact-specific, totality-of-the-circumstances dive into a defendant's use of force, *see, e.g.*, *Havens v. Johnson*, 783 F.3d 776, 781 (10th Cir. 2015) (excessive force). Looking at a few defendants at random from Mr. Garrett's list illustrates the point. Defendants Michael Moore and Amanda Lucero, for example, are alleged Colorado residents and employees of Fremont County. Beyond

---

[4] Much of the language Mr. Garrett cites on pleading standards comes from pre-*Twombly* cases from other jurisdictions. (*See* Doc. 90, at 2–3; Doc. 80, at 3–4.)

that, the Amended Complaint does not say the capacity of their employment; level of responsibility; what, if any, actions they took or failed to take; or the mindset either had with respect to Mr. Garrett. Taking another, Mr. Waters is alleged to be a Colorado resident and a subcontractor of "one or more of the Corporate Defendants," who was responsible for medical care, and, "among other" persons, to have generally failed to properly assess, monitor, and treat Mr. Garrett. This exercise yields the same results with the dozens of other defendants on Mr. Garrett's list, save the three defendants noted above. Just as in *Robbins*, "[t]he complaint makes no mention of which if any of these defendants had direct contact with [the plaintiff], and for those defendants who had no direct contact, how they might be individually liable for deprivations of [the plaintiff's] constitutional rights." 519 F.3d at 1250. For failure to plausibly allege identifiable violations committed by them, the constitutional claims against the majority of Individual Defendants must be dismissed without prejudice.

## C. First, Fourth, and Fourteenth Amendment Claims against Ms. Brassfield, Mr. Merlo, and Mr. Green.

The Court assumes, because they are included in the group of FCDC Personnel, that Ms. Brassfield, Mr. Merlo, and Mr. Green are alleged to have violated Mr. Garrett's Fourth and Fourteenth Amendment Rights.[5] Mr. Merlo and Mr. Green are the only defendants in the First Amendment claim. Mr. Garrett

---

[5] The Court is required to make this assumption because, except for the First Amendment Claim, no defendants are mentioned by name in any of the delineated causes of action. (*See, e.g.*, Doc. 14, at 30 ("FIRST CLAIM FOR RELIEF . . . Against All Individual Defendants").

clarifies in his responses to the motions to dismiss that his Fourteenth Amendment claim for deliberate indifference to serious medical needs stems from the extraordinary restraint and isolation he underwent *after* he wounded himself, together with the defendants' subsequent failure to provide meaningful mental health or medical care. (Doc. 87, at 5.)[6] His briefing does not further clarify his other theories regarding the First or Fourth Amendments.

The Defendants argue they are protected from suit under the doctrine of qualified immunity. A defendant's invocation of qualified immunity imbues a plaintiff with a heavy two-part burden. He must show (1) the facts support a violation of a constitutional right, and (2) that right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson v. Callahan*, 555 U.S. 223 (2009) (permitting a court to analyze these factors in any order); *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015). A plaintiff may satisfy the clearly established portion of this burden "by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Cox*, 800 F.3d at 1247 (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015); citing *Weise v. Casper,* 593 F.3d 1163, 1167 (10th Cir.

---

[6] Ms. Brassfield's alleged incitation that Mr. Garrett should kill himself, therefore, does not appear to be at play because it came earlier. The Amended Complaint's cause of action for deliberate indifference to serious medical needs under the Fourteenth Amendment does not specify what conduct supports it. (Doc. 14, at 32–33.) The Court assumes, therefore, that Mr. Garrett's clarification represents the more precise statement of the claim.

2010)). Qualified immunity applies unless the official's conduct violated such a clearly established right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Though these defendants clearly raised it, absent from Mr. Garrett's briefing is any mention of qualified immunity, or even any attempt to demonstrate how his allegations, if true, carry the heavy associated burden. This failure is fatal to his constitutional claims against the FCDC Personnel. *See, e.g.*, *Grusendorf v. City of Oklahoma City*, 816 F.2d 539, 545 (10th Cir. 1987) (declining to reverse judgment by district court in favor of defendants, which deemed qualified immunity defense confessed, after plaintiff failed to address it); *Rodriguez v. Town of Eagle Bd. of Trustees*, No. 04-cv-1759, 2006 WL 3328040, at *4 (D. Colo. Nov. 15, 2006) ("In this case, Plaintiffs have failed to respond to [Defendant's] affirmative defense of qualified immunity. Consequently, Plaintiffs have failed to meet their burden of establishing that [Defendant] violated any of their constitutional rights."); *Roberts v. Smotherman*, No. CIV-06-136-F, 2006 WL 3166559, at *2 (W.D. Okla. Oct. 13, 2006) ("Because Plaintiff did not respond to Defendant's claim of qualified immunity, Defendant Smotherman is necessarily entitled to dismissal of the claims against him." (citing *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001)); *Smith v. Bd. of Cty. Comm'rs of Oklahoma Cty., Okla.*, No. 10-cv-782, 2011 WL 3299072, at *2 (W.D. Okla. Aug. 1, 2011) ("Plaintiffs have failed to respond to [the] qualified immunity defense. . . . Therefore, [Defendant] is entitled to the dismissal of Plaintiffs' § 1983 claim.").

Mr. Garrett provides, in fact, no defense whatsoever of his First or Fourth Amendment claims—either inside or outside the context of qualified immunity. And his limited conclusion regarding the Fourteenth Amendment protection is indistinguishable from one which the Tenth Circuit has called "anemic" and does nothing to define the contours of the clearly-established-right inquiry. *Compare* Am. Compl. ¶ 155 ("Plaintiff had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to his known serious medical needs.") *with Cox*, 800 F.3d at 1245–46 ("[Plaintiff] made no more than an anemic attempt to carry this burden as to the clearly-established-law question, merely asserting in bare-bones fashion that [the] constitutional 'right to adequate medical care and to be free from deliberate indifference ha[d] been clearly established for decades.'"). The claims against the FCDC Personnel—including those against Ms. Brassfield, Mr. Merlo, and Mr. Green—are therefore dismissed without prejudice.

### D. Claim Against Fremont County Defendants and Corporate Defendants for Deliberate Indifference to Serious Medical Needs in Violation of the Fourteenth Amendment

#### i. Underlying Protections Afforded

Pretrial detainees, like Mr. Garrett, are entitled to the same degree of protection regarding medical attention under the Fourteenth Amendment as that afforded convicted inmates under the Eighth Amendment. *Martin v. Bd. of Cty. Comm'rs of Cty. of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990); *see also Barrie v. Grand County*, 119 F.3d 862, 867 (10th Cir. 1997) ("The constitutional protection

against deliberate indifference to a prisoner's serious medical needs. . . applies to pretrial detainees through the due process clause of the Fourteenth Amendment."). The Fourteenth Amendment's Due Process Clause, therefore, provides a cause of action for injuries caused by prison officials' "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted).

A claim of deliberate indifference to serious medical needs includes both an objective and a subjective component. *Mata*, 427 F.3d at 751. The objective prong examines whether the deprivation of care at issue was "'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Id.* at 753. "The subjective prong examines the state of mind of the defendant, asking whether 'the official kn[e]w of and disregard[ed] an excessive risk to inmate health or safety.'" *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

On the objective prong, a "sufficiently serious medical need [i]s 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Mata*, 427 F.3d at 753 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). Under the subjective prong, "the responsible official must have a sufficiently culpable state of mind." *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1022 (10th Cir. 1996). A pre-trial detainee in a county jail "does not have a claim against his custodian for failure to provide adequate medical attention unless the custodian

knows of the risk involved, and is 'deliberately indifferent' thereto." *Barrie*, 119 F.3d at 868–69. The subjective mental state necessary is something akin to criminal recklessness. "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 836–37. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "[C]laims sounding in negligence or medical malpractice" are not enough. *Sherman v. Klenke*, 653 F. App'x 580, 586 (10th Cir. 2016) (quoting *Farmer*, 511 U.S. at 838).

### ii. Entity Liability in General

Section 1983 creates a cause of action for constitutional violations by public entities. In *Monell v. Dep't of Soc. Servs. of City of New York*, the Supreme Court enunciated relevant liability standard for such entities: A plaintiff must identify "a government's policy or custom" that caused the injury. 436 U.S. 658, 694 (1978). To state a claim, a plaintiff must plausibly allege three components: (1) official policy or custom, (2) causation, and (3) state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769–70 (10th Cir. 2013). Private entities may be held responsible for any constitutional harms caused by their employees acting under color of state law. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (finding *Monell* and its progeny applicable to private defendants acting under color of state law); *see also Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir.

2005) ("[I]t is now well settled that *Monell* also extends to private defendants sued under § 1983.")

### a. Official Policy or Custom

In *Monell*, the Supreme Court found that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." 436 U.S. at 691. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). And even though municipal liability is not identical to *respondeat superior* liability, there can be no such liability absent the commission of a constitutional tort by a municipal employee. *Myers v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 151 F.3d 1313, 1316 (10th Cir. 1998). A challenged practice may be deemed an official policy or custom for Section 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. *Schneider*, 717 F.3d at 770. A plaintiff must show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury. *See Brown v. County*

*Commissioners of Bryan Cty., Okla.*, 520 U.S. 397, 403 (1997); *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

### b. Causation

To establish causation, the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." *Id.* This requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. A plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* And municipal liability in a Section 1983 case cannot be established on a theory of vicarious liability. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770.

### c. State of Mind

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407; *see also City of*

*Canton*, 489 U.S. at 389. The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction[.]" *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (internal citations omitted).

### iii. Section 1983 *Monell* Claims

These claims implicate the Corporate Defendants and Fremont County Defendants. The Fremont County Defendants include several current and former Fremont County Sheriffs in their official capacities (referred to here singularly as "Sheriff"), as well as the Board of County Commissioners ("Board"). The Corporate Defendants are a group of six medical provider companies—contractors, subcontractors, and successors—lumped together by fact of their service relationship with the detention center managed by the Sheriff. The relevant cause of action asserts "failures in training, supervision, and policy regarding providing necessary medical supervision, care, and intervention." These defendants are not alleged to have personally participated in any of the events at issue. The question is

whether a policy or practice, deliberate indifference, the involvement these entities'
personnel, and causation are adequately alleged.

The pleading problems that plague the allegations against the mass of
individuals also infect the claims against these employers. The Amended
Complaint, without attributing them to any defendant, speaks generally about
policies or practices of placing mentally ill persons in solitary confinement or
restraining them to prevent self-harm. But there are no allegations suggesting that,
if proven, such policies are unconstitutional or, at the very least, maintained with
deliberate indifference to known or obvious unconstitutional consequences. And it is
unclear which defendant's policies might be at issue. When there are specific
allegations of mistreatment, it is not clear which entity or entities' agents are
alleged to have placed Mr. Garrett in solitary confinement, over-medicated him,
restrained him, fed him sausage grease, made him go without a blanket, or
committed any other conduct. *See Myers*, 151 F.3d at 1316 (noting that a plaintiff
must prove that an employee of the policymaker committed a constitutional
violation, or else the policymaker cannot be liable). The allegations of general
failures to train and supervise fail for the same reasons. As with the majority of
Individual Defendants, the Amended Complaint makes no attempt to parse the
conduct of these defendants into identifiable actions attributable to any one of them.
The Amended Complaint thus fails to demonstrate which, if any, entity's policy or
practice was the moving force behind the unconstitutional result. *See Brown*, 520
U.S. at 404. The *Monell* claims are accordingly dismissed without prejudice.

There is also dispute as to whether the Board is a proper defendant at all because, as the Board argues, it has no policy-making authority over the Sheriff and his FCDC Personnel deputies. Because the Court dismisses on other grounds, it need not address this dispute at this time.

### E. Claims for Medical Negligence

None of the Medical Provider Defendants is specifically alleged to have committed any particular wrong. Nor does the Amended Complaint even allege which provider works for which company and in what capacity. The medical negligence claim against the Corporate Defendants generally alleges their vicarious liability for the conduct of their employees and, separately, a failure to exercise reasonable care in the training and supervision of them. Claims under these theories cannot proceed without viable claims against the employees at issue, which cannot proceed without fair notice of their nature. Under these circumstances, the Corporate Defendants cannot be liable for conduct by, or be said to have failed to adequately train, unspecified personnel. These claims are dismissed without prejudice.

### F. Claims for Violations of the ADA and Rehabilitation Act

The Americans with Disabilities Act ("ADA") prohibits discrimination by public entities on the basis of disability. The Rehabilitation Act prohibits such discrimination by recipients of federal funding. The ADA requires that the detention facility provide people with disabilities "meaningful access" to its programs and services. *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185,

1195 (10th Cir. 2007). To state a claim under the ADA (and the Rehabilitation Act)[7] a "plaintiff must allege that: (1) he is a qualified individual with a disability, (2) he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Id.* at 1193.

Mr. Garrett asserts these claims against the Fremont County Defendants. There is no present dispute concerning his allegations on the first two elements— disability and denial of benefits—but defendants argue that official actions taken in response to disruptive or dangerous conduct are not sufficient to show discrimination caused by a disability even if the conduct itself may have been caused by a disability. *See Hughes v. Colorado Dep't of Corr.*, 594 F. Supp. 2d 1226, 1243 (D. Colo. 2009). The Fremont County Defendants also posit "a defense to a charge of [disability] discrimination if a [claimant] poses a direct threat to the health or safety of himself or others." *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1290–91 (10th Cir. 2000); *see also* 28 C.F.R. § 35.139(a) ("This part does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others.").

---

[7] "'The Rehabilitation Act is materially identical to and the model for the ADA,' the elements are the same except that the Rehabilitation Act requires that defendant receive federal funds." *Anderson v. Colo. Dep't of Corr.*, 848 F. Supp. 2d 1291, 1300 (D. Colo. 2012) (quoting *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir. 1997)).

In *Hughes*, cited by defendants, a parolee with bi-polar disorder and schizophrenia walked off the residential community grounds in which he was required to live. Authorities arrested Hughes and the parole board argued for revocation of his parole. Hughes then claimed the parole board had denied him the benefits of completing his sentence on parole in violation of the ADA. In granting the board's motion to dismiss on this claim, the court refused to require differential treatment, despite the plaintiff's disability: "even if continuation of Hughes'[s] parole—a matter wholly within the Parole Board's discretion—could be considered one of the 'benefits of the services, programs or activities' offered . . . , there is no indication Hughes was subject to different disciplinary standards than other non-disabled parole violators." *Id.* at 1242–43. Mr. Garrett does not address *Hughes*. He just argues that he was not permitted the benefits of certain programs that he asserts would have served him better. "Plaintiff believes the [ ] discipline should have been meted out with a consideration of his disability." *Id.* at 1243 (quoting *Scherer v. Pennsylvania Dept. of Corr.*, No. 3:2004–191, 2007 WL 4111412 (W.D. Pa. Nov. 16, 2007)).

Mr. Garrett was not disciplined, but it is apparent, from the face of the Amended Complaint, that he was unstable and a danger to himself, which is why he was restrained. There is no suggestion he was mistreated because any defendant harbored animus over his disability. Mr. Garrett does not argue that non-disabled detainees would have access to additional or better services or programs. Essentially, like *Hughes*, he asks for access to *additional* services or programs based

on his disability. The ADA does not require them. He must not only allege that he was deprived of certain programs or services that others have access to, but that such deprivation was accompanied by discriminatory animus. *See, e.g.*, *Stiles v. Judd*, No. 8:12-cv-02375-T-27, 2013 WL 4714402, at *8–*9 (M.D. Fla. Aug. 30, 2013) (finding isolation and extended periods of restraint following attempted suicide, without animus, insufficient to state an ADA claim); *Lara-Grimaldi v. Cty. of Putnam*, No. 17-cv-622, 2018 WL 1626348, at *21 (S.D.N.Y. Mar. 29, 2018) (dismissing ADA claims where the plaintiff "merely contends that [she] was not property treated for her physical and mental health issues and addiction, not that she was mistreated *because* of them.") (emphasis in original).

The picture Mr. Garrett's Amended Complaint paints is an ugly one, but it fails to allege than any of the alleged failings in his detention and treatment were informed by any degree of actual animus against him, or "by reason of" his condition. At worst, the allegations demonstrate that persons at the detention center did not know of, or possess, any reasonable alternative course of action to prevent additional self-harm. There is no indication that, even if he were entitled to specialized treatment, Mr. Garrett was subject to different standards than would have been afforded to other non-disabled persons with a demonstrated aim to self-harm. For these reasons, the ADA and Rehabilitation Act claims are dismissed without prejudice.

### G. Claim for Negligent Operation of a Jail

Mr. Garrett asserted a claim against the FCDC Personnel, Fremont County, and the Medical Provider Defendants for negligence in the operation of a jail. The decision whether to exercise pendent jurisdiction over state law claims, even after dismissal of every foundational federal claim, has traditionally been a matter within the court's discretion. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Court applies state substantive law over state law claims in a federal question lawsuit. *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999).

As the FCDC Personnel correctly assert, and Mr. Garrett agrees, the statute of limitations for a negligence claim against a sheriff, deputy, "or any other law enforcement authority," is one year. Colo. Rev. Stat. § 13-80-103(1)(c); *see also Mercer v. Peterson*, No. 09–cv–00654, 2011 WL 2581515, at *13 (D. Colo. Apr. 6, 2011) ("The term sheriffs 'includes the whole class of officers performing the duties of the office of sheriff,' including deputy sheriffs.") (citing *Bailey v. Clausen*, 557 P.2d 1207, 1211 (Colo. 1976)). The parties agree this claim is untimely. The Court dismisses it with prejudice.[8]

---

[8] To the extent that the claim was brought separately against the County (*see* Doc. 14, at 38–39 (asserting official capacity claims against county personnel)), it is also dismissed with prejudice because it has no direct authority over the jail independent of the Sheriff. *See Archuleta v. Adams County Bd. Of Cty. Com'rs*, No.

## III. CONCLUSION

For the foregoing reasons, the entire Amended Complaint (Doc. 14) is **DISMISSED WITHOUT PREJUDICE**, except for Claim Six (Negligence in the Operation of a Jail), which is **DISMISSED WITH PREJUDICE** with respect to the Fremont County Defendants and FCDC Personnel. Plaintiff may file a second amended complaint within fourteen days of the entry of this order. If filed, such an amended complaint will comply with federal pleading standards as set forth herein.

Dated: August 23, 2019.

BY THE COURT:

*/s/ Daniel D. Domenico*
Daniel D. Domenico
United States District Judge

---

07-cv-2515, 2011 WL 3799029, at *10 (D. Colo. June 14, 2011) ("A Board of County Commissioners has certain enumerated powers and operation of the jail is not one of them") (citing Colo. Rev. Stat. § 30-11-107)). With respect to the Medical Provider Defendants, they are not alleged to have been involved with the operation of the jail. If they were, the pleadings suggest that they would be "law enforcement officers" for purposes of the statute of limitations. *See Nieto v. State*, 952 P.2d 834, 839 (Colo. App. 1997), *aff'd in part, rev'd in part*, 993 P.2d 493 (Colo. 2000) ("We therefore conclude the operation of a correctional facility for purposes of § 24–10–106(1)(b) includes the provision of medical care necessary for basic health."). Mr. Garrett's position as to whether claims against the Medical Provider Defendants were "performing the duties of the office of sheriff" is unclear and should also be dismissed.